IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MICHAEL TYRONE McCULLON,** | : | **Civil No. 3:10-CV-1541** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **( Judge Kosik)** |
| | : | |
| **THOMAS BROUSE, et al.,** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **Defendants.** | : | |

## REPORT AND RECOMMENDATION

### I.     Statement of Facts and of The Case

#### A.     Procedural History

This is a *pro se* civil rights case that was first brought by a federal prisoner, Tyrone McCullon, through the filing of a civil rights complaint on July 27, 2010, (Doc. 1.), which he subsequently amended on August 23, 2010, (Doc. 14.) and December 3, 2010.  (Doc. 36.)  In these complaints, McCullon alleged that prison officials violated his Eighth Amendment right to be free from cruel and unusual punishment by employing excessive force against him during, and after, an August19, 2009, affray at the Lewisburg Federal Penitentiary.  (Id.)  McCullon further alleged that prison officials conspired to falsely discipline him for his role in this physical confrontation with staff.  (Id.)  McCullon originally named the correctional staff who were allegedly involved in this affray as Defendants, and also named as Defendants:

(1) a correctional official who wrote an incident report which served as part of the factual basis for findings that led to McCullon's discipline; (2) the correctional supervisors who allegedly oversaw McCullon's care in the hours immediately following this incident; (3) correctional investigators, who played roles in the disciplinary proceedings brought against McCullon, investigators who McCullon faulted for conducting an inadequate investigation into this matter; and (4) the prison warden, who was named as a Defendant because he was responsible for the operation of the prison in August 2009, and, in McCullon's view, failed to adequately respond to his complaints. (Id.)

On December 20, 2010, the Defendants filed a motion to dismiss the complaint, or in the alternative for summary judgment. (Doc. 37.) After extended pre-trial proceedings, we issued a Report and Recommendation which recommended that the Defendant's motion to dismiss, or in the alternative for summary judgment, be granted, in part, and denied, in part. (Doc. 62.) Specifically, we recommended that McCullon's complaints be dismissed as to Defendants Bledsoe, Perrin, Raup and Fosnot, but that the motion be denied as to Defendants Brouse, Stuart, Johnson and Sassaman.

With respect to these four Defendants, who were alleged to have had direct contact with McCullon during this August 19, 2009, affray at the Lewisburg Federal

Penitentiary, we concluded that, at this preliminary stage of the litigation "we cannot at this early juncture engage in a speculative assessment of [the] evidence . . . . That task must await another time, and another proceeding or motion." (Id., p. 24.)

We now are presented with this task, and this motion, a fully-documented summary judgment motion lodged on behalf of the remaining Defendants in this matter. (Doc. 114.)  McCullon, in turn, has responded to this motion by filing three summary judgment motions, arguing that he is entitled to judgment against the Defendants. (Docs. 124, 136, 152.)[1]  These motions have been fully briefed by the parties, (Docs. 113-116,  124, 128, 129, 136, 137, 140-57, 158, 163, 166-169.), and are ripe for resolution.

## B.     Factual Background

### 1.     Michael McCullon

Michael McCullon ("McCullon"), is a federal inmate who was incarcerated at the United States Penitentiary in Lewisburg, Pennsylvania in August 2009. (Doc. 114, ¶1.)  McCullon's criminal history is marked by repeated episodes of violent behavior, and McCullon is currently serving a 262-month sentence for a crime of violence, bank robbery and possession of a firearm and ammunition by a convicted

---

[1]Review of McCullon's various summary judgment motions reveal that they are, in large measure, simply responses to the defendants' summary judgment motion.

felon. (Id., ¶3.) Prior to August, 2009, McCullon also had an extensive prison disciplinary record within the federal prison system that was also marked by unrelenting violence and included some thirty citations for offenses including assault (twice), threatening bodily harm (four times), insolence toward staff (five times), refusing to obey an order (five times), interfering with a security device by blocking food slot with arm, engaging in sexual acts (thirteen times), indecent exposure (four times), refusing a work assignment (three times), possessing an unauthorized item (one time), being in an unauthorized area (two times), and falsifying a statement (one time). (Id., ¶4.)[2]

## 2.   McCullon's August 19, 2009, Incident With Officer Brouse

This case arose out of an incident which occurred in the Restricted Housing Unit (RHU) of the United States Penitentiary, Lewisburg, on August 19, 2009.  On August 19, 2009, the Plaintiff, Michael McCullon, was housed in Cell 218 in the RHU.  Shortly after 11:00 a.m. on August 19, 2009, McCullon became displeased

[2]Moreover following this August 19, 2009, incident McCullon has received an additional fifteen incident reports and has been found guilty of failing to stand count, interfering with taking count, threatening bodily harm to an officer (twice), assaulting an officer (twice), being insolent to an officer (three times), engaging in a sexual act (three times), interfering with safety/security devices (three times), destroying property over $100, disruptive conduct, refusing to obey an order (twice), and failing to follow safety regulations. (Id., ¶5.)

with the manner in which Correctional Officer Thomas Brouse released him from some restraints.  (Docs. 44, 61.)  McCullon voiced that displeasure through an act which violated prison rules:  he began throwing food trays out of his cell through the cell wicket slot[3] into the cellblock corridor.

This incident was captured on videotape by prison surveillance cameras.  That videotape evidence constitutes an immutable witness to the chronology of these events, and enables us to precisely identify what transpired between McCullon and Officer Brouse on August 19, 2009.  Viewing the facts in the light depicted by the videotape, see Scott v. Harris, 550 U.S. 372, 380-81 (2007), we find on August 19, 2009, Officer Brouse arrived at Cell Z-218, McCullon's cell, at approximately 11:05 a.m.  (Doc. 114, ¶13.)  Officer Brouse then unlocked the wicket slot of the door to Cell Z-218 at USP Lewisburg at 11:06 a.m. (Id., ¶14.)  At 11:07 a.m., McCullon's cellmate placed his wrists through the wicket slot in the door of Cell Z-218, and Defendant Brouse applied handcuffs to his cellmate's wrists without incident.  (Id., ¶16.)  Seconds later, McCullon placed his wrists through the wicket slot in the door of cell Z-218, and Defendant Brouse applied handcuffs to McCullon's wrists.  (Id., ¶17.)  The surveillance video reveals that, in fact, it only took Brouse approximately

---

[3]A wicket slot is a small hinged slot in a cell door through which food trays and other items may be passed to inmates.

twenty seconds to apply handcuffs to McCullon's wrists.  (Id., ¶20.)  At 11:08 a.m., the door to Cell Z-218 opened, and McCullon's cellmate exited the cell and stood in the corridor facing away from Cell Z-218.  (Id., ¶21.)  Once McCullon's cellmate was safely removed from the cell, at approximately 11:08:11, McCullon put his hands through the wicket slot in the door of Cell Z-218, to enable Officer Brouse to remove the restraints from McCullon's wrists.  (Id., ¶24.)  It took Brouse some twenty-six seconds to remove the restraints from McCullon's wrists.  (Id., ¶25.)  Surveillance video reveals that Brouse first removed the restraint from McCullon's left wrist, at which time only McCullon's hands extended out the wicket slot.  (Id., ¶28.)  Then, as Brouse attempted to remove the restraint from McCullon's right wrist, McCullon gradually pushed his right arm further out the wicket slot, until his entire arm extended into the corridor.  (Id., ¶29.)

Seconds later, this encounter unexpectedly escalated into a physical affray, as McCullon shoved two food trays out of the wicket slot in the door of Cell Z-218 onto the floor, and kept his hand in the wicket slot, preventing Officer Brouse from closing the cell aperture.  (Id., ¶30.)  Reacting to McCullon's actions,  Brouse placed his hand underneath the wicket door to Cell Z-218, and held it there for several seconds, waiting for McCullon to withdraw his hand from the wicket slot so that he could close it.  (Id., ¶31.)  McCullon responded to this gesture by tossing two additional

food trays out of the wicket slot in the door of Cell Z-218.  (Id., ¶32.)  A few seconds later, Brouse attempted to close the wicket slot on the door of Cell Z-218 after McCullon had withdrawn his hands from the food slot, but McCullon pushed it back open.  (Id., ¶33.)  As McCullon reached through the wicket slot in the door of Cell Z-218 he attempted to strike Officer Brouse with a closed fist, and then continued to thrust his hands through the wicket slot to prevent Officer Brouse from closing the cell aperture.  (Id., ¶34.)

Presented with this outburst, correctional staff can be observed responding with appropriate and measured force.  Thus, Officer Brouse initially stepped back from the door to Cell Z-218 to avoid being struck by McCullon, and remained there at a safe distance for approximately ten seconds, while another correctional officer closed the food slot with his foot.  (Id., ¶35.)  Once the food slot was held closed in this fashion, Officer Brouse leaned against the wicket slot with his hip while he locked the wicket slot.  (Id., ¶36.)  McCullon violently resisted these efforts, and attempted to push the wicket slot back open six times in the span of five seconds.  (Id., ¶37.)[4]  Brouse and

---

[4]While McCullon subsequently endeavored to justify his behavior at a DHO hearing on October 20, 2009, by stating that after the officer removed the restraint from his left hand, the officer twisted the hand restraint on his right hand for no reason. The surveillance video, however, does not reflect any undue malicious or sadistic conduct on Brouse's part during the few minutes when he has McCullon in restraints. Similarly, during the DHO hearing, McCullon's cellmate testified that he observed Defendant Brouse "twisting his cellie's cuffs unnecessarily."

other correctional staff then stacked the food trays and walked away from the area of Cell Z-218. (Id., ¶43.)

### 3.    McCullon Is Removed From His Cell

McCullon's assaultive behavior compelled an institutional response and at 1:04 p.m., on August 19, 2009, a use of force team was assembled in response to the incident.  Like McCullon's initial encounter with staff, this use of force epsiode was videotaped and that video enables us to precisely identify what transpired during McCullon's cell extraction on August 19, 2009.  Viewing the facts in the light depicted by the videotape, see Scott v. Harris, 550 U.S. 372, 380-81 (2007), we find as follows:

Lieutenant Stuart was the supervisory lieutenant over the use of force team responsible for McCullon's forced cell move on August 19, 2009.  (Doc. 114, ¶57.) The use of force team consisted of Lieutenant Stuart, five staff members, a BOP psychologist, a physician's assistant, and a camera operator.  (Id., ¶59.)  During the use of force procedure on August 19, 2009, it was the duty of a psychology treatment specialist to attempt to gain voluntary cooperation from McCullon through the use of confrontation avoidance techniques, communication skills, and the rapport that this

_____

However, the surveillance video demonstrates on August 19, 2009, McCullon's cellmate was facing away from the door to Cell Z-218, and, therefore, his cellmate did not observe Defendant Brouse's actions as he removed McCullon's restraints.

staff member established with McCullon.  (Id., ¶67.)  It was the responsibility of a

physician's assistant, in turn, to evaluate and treat any injuries, to check restraints to

ensure they did not compromise McCullon's circulation, and if chemical agents were

used, to supervise decontamination.  (Id., ¶68.)

On August 19, 2009, following a staff briefing by Lieutenant Stuart, the use of

force team was assembled at Cell Z-218, where the psychology services

representative spoke the McCullon and asked if he would avoid confrontation and

submit to restraints.  (Id., ¶69.)  This effort to avoid the use of force was successful.

McCullon agreed to submit to ambulatory restraints and staff applied hand restraints

on McCullon through the wicket, without incident, before the use of force team

entered Cell Z-218.  (Id., ¶¶71-2.)  The use of force video further shows that on

August 19, 2009, while in Cell Z-218, members of the use of force team applied

ambulatory restraints to McCullon's legs, after which they put socks on his feet.  Staff

then removed McCullon's hand restraints, and placed a clean t-shirt on McCullon

before reapplying the hand restraints.  (Id., ¶73.)

After applying ambulatory restraints upon McCullon, without incident, the use

of force team moved McCullon from Cell Z-218 to Cell Z-204.  (Id., ¶74.)  Once

McCullon was moved to Cell Z-204, the physician's assistant checked his

temperature and vital signs, checked the restraints, and examined an injury that

McCullon had sustained to a finger prior to this move. (Id., ¶75.) The use of force team then escorted McCullon to medical services where the physician's assistant cleansed McCullon's finger, examined the wound, applied medication with a cotton swab, and then applied a band-aid. (Id., ¶76.) After McCullon received medical treatment to his finger, the use of force team escorted him back to Cell Z-204, where McCullon sat on the lower bunk and the use of force team exited the cell. (Id., ¶77.) At no time during this cell move was McCullon or to any of the unit team injured in any fashion, (Id., ¶78), and at the conclusion of McCullon's forced cell move the physician's assistant reported that there was no compromise of McCullon's distal circulation caused by the restraints, and noted that there was a fifteen millimeter shallow, somewhat linear dermal avulsion on McCullon's hand which was cleaned and dressed. (Id., ¶79.) Furthermore, the use of force video demonstrates that, at no time during the forced cell extraction did McCullon complain that the ambulatory restraints were too tight or caused him discomfort. Quite the contrary, McCullon was silent throughout the entire procedure. (Id., ¶80.)

### 4.     McCullon Remains In Restraints for 24 Hours

Following this cell removal, McCullon remained in restraints for approximately 24 hours, from August 19, 2009, at 1:30 p.m. through August 20, 2009, at 12:45 p.m. This measure was undertaken in accordance with prison policy which directs that

when use of restraints is necessary, the restraints should remain in place on the inmate until the prisoner regains his self-control. (Id., ¶85.) That policy expressly called for the continued restraints following physically disruptive behavior and approved the use of ambulatory restraints for a period of time in order to protect staff and others, pending an assessment by staff to determine whether the inmate has regained self-control. (Id., ¶88.) When an inmate is placed in ambulatory restraints, prison policy directs that staff shall check on the restrained inmate at least every fifteen minutes. (Id., ¶¶89-90.) During these fifteen-minute restraints checks staff are required to describe the inmate's behavior, including verbal and non-verbal comments, and to notify health/psychology services or supervisors for assistance as needed. (Id., ¶91.) In this case, prison staff performed the fifteen-minute restraints checks on McCullon during the entire time that he was restrained between August 19, 2009, at 1:30 p.m. and August 20, 2009, at 12:45 p.m. (Id., ¶92.)

Prison policy sets further safeguards on inmates who are being held in restraints. Under this policy when an inmate is placed in ambulatory restraints, a lieutenant must assess the inmate every two hours and, "[t]he goal of the two-hour reviews is to determine, as soon as possible, that the inmate has regained self-control and may be placed in lesser restraints." (Id., ¶93.) Prison policy also requires that when an inmate is placed in ambulatory restraints, qualified health personnel must

initially assess the inmate to ensure appropriate breathing and response, and to ensure that the restraints have not restricted or impaired the inmate's circulation. (<u>Id</u>., ¶¶95-96.) <u>Q</u>ualified health personnel are then to visit the restrained inmate at least twice during each eight-hour shift, and must document the following: date and time of examination; examining staff member; body position; restraints and adequate circulation; vital signs; medication; injuries; the inmate's intake, output, and hydration; along with any possible medical reasons for behavior; deterioration of inmate's health; and any other significant findings and comments. (<u>Id</u>., ¶¶97-100.)

In this case, the prison records of the oversight and care afforded to McCullon while he was restrained reveal that his health and safety were closely monitored while he was briefly held in restraints. Thus, medical staff performed an initial assessment of McCullon at 1:19 p.m. on August 19, 2009, at which time, staff checked McCullon's vital signs, debrided a wound on McCullon's right middle finger before the forced cell move, and noted that the restraints did not compromise McCullon's circulation. (<u>Id</u>., ¶101.)

Ten minutes later, on August 19, 2009, at 1:30 p.m., Lieutenant Stuart noted that McCullon was combative after being placed in ambulatory restraints for an attempted assault of an officer. (<u>Id</u>., ¶102.) Stuart then performed a two-hour check on August 19, 2009, at 2:00 p.m., and wrote, "Inmate remains agitated and non-

compliant.  He is aggressive toward staff.  Continue in restraints." (Id., ¶103.)  On August 19, 2009, at 4:00 p.m., Stuart performed another two-hour check of McCullon and wrote, "Inmate still agitated and complaining about restraints left cuff loosened slightly.  Continue in restraints." (Id. ¶104.)  The next lieutenant restraints check was performed on McCullon by Defendant Sassaman on August 19, 2009, at 6:00 p.m., at which time the lieutenant wrote, "Inmate displayed an aggressive and aggravated attitude.  Inmate demands to see medical staff for a minor cut on his finger.  Inmate was advised that medical staff would be around to conduct checks shortly.  Remain restrained." (Id., ¶105.)

One hour and fifteen minutes later, at 7:15 p.m., medical staff examined McCullon at which time McCullon complained that his finger would not stop bleeding. (Id., ¶106.)  Medical staff immediately took steps to address McCullon's presenting medical concern, monitoring McCullon's vital signs, noting that McCullon was irritable, but did not appear to be in distress; determining that the radial pulse and capillary refill in McCullon's arms were normal; confirming that the dorsalis pedis and capillary refill in his legs were normal; and concluding that there was only minimal bleeding of his right finger injury. (Id., ¶107.)  Medical staff then cleansed McCullon's finger injury with hydrogen peroxide, applied a bulky pressure bandage to control bleeding, and instructed McCullon to avoid bending his finger to help

induce successful clotting and healing of the wound.  (<u>Id</u>., ¶108.)  At the same time, health service staff performed a restraint check, monitored McCullon's vital signs, cleansed and redressed a laceration on McCullon's right fifth finger, and noted that McCullon had adequate circulation with the restraints and was in no distress. (<u>Id</u>., ¶109.)

This careful monitoring of McCullon's health and safety continued throughout the evening of August 19-20, 2009.  Thus, on August 19, 2009, at 8:00 and 10:00 p.m. restraint checks were performed on McCullon.  This monitoring revealed that McCullon remained in an angry, hostile state throughout the evening.  Thus, the entry on the Two-Hour Lieutenant Restraints Check Form for August 19, 2009, at 8:00 p.m. stated, "Inmate displeased about [being] placed in restraints.  Remain in restraints." The entry on the Two-Hour Lieutenant Restraints Check Form for August 19, 2009, at 10:00 states, "Inmate upset and started banging on door due to his restraints are kept on.  Remain in restraints."  (<u>Id</u>., ¶110-12.)

Medical staff also carefully monitored and assessed McCullon throughout the evening.  Thus, on August 19, 2009, at 10:00 p.m., medical personnel examined McCullon and noted that he was irritated, and refused treatment when asked if medical staff could assess him and take care of his finger.  (<u>Id</u>., ¶113.)  Despite McCullon's refusal to cooperate, medical staff were able to observe that the restraints

were causing no visible compromise to McCullon's circulation, and that he had a laceration to his right third finger.  (Id., ¶114.)

For his part, McCullon continued to exhibit angry, truculent behavior throughout the evening and into the morning hours of August 20, 2009.  Thus, on August 20, 2009, at 12:00 a.m., when Lieutenant Johnson performed a two-hour lieutenant's check on McCullon he reported that: "[Inmate] restraints checked. [Inmate] stated, 'This is fucking bullshit.'  Paramedic checked inmate.  Remain in restraints."  (Id., ¶115.)  Medical staff who followed up and evaluated McCullon on August 20, 2009, at 12:15 a.m. noted that McCullon had a hostile attitude and had removed the dressing from his finger.  While McCullon refused to allow his vital signs to be checked, staff determined that he had normal radial pulse and capillary refill in his arms, normal dorsalis pedis and capillary refill in his legs, that there were no significant findings, and McCullon appeared to be in no distress.  (Id., ¶116.)  At 2:00 a.m., when Lieutenant Johnson performed a two-hour check he was once again confronted by an angry, hostile inmate who: "stated, 'Take these fucking cuffs off. I can't sleep.'"  Concluding that McCullon's "Attitude [was] poor [Johnson found that McCullon should] Remain in restraints."  (Id., ¶117.)

Periodic lieutenant examinations of McCullon through the morning of August 20, 2009, continued to document his poor attitude and profane response to staff, with

McCullon alternately exhibiting sullen silence or denouncing staff in obscene terms, stating "It is bullshit that I tried to assault an officer." (Id., ¶¶117, 119, 122, and 125.) Prison medical personnel, however, continued to closely assess and monitor McCullon's health while he was restrained, noting that McCullon was eating and drinking, that he had used the toilet, and that the circulation at the site of McCullon's restraints was normal, that his finger was not bleeding and that he was voicing no medical complaints. (Id., ¶¶120, 121, 123 and 124.)

At noon on August 20, 2009, McCullon began to compose himself. As Lieutenant Stuart observed in his two-hour check report: "Inmate appears to be calming down. Still slight agitation. Continue in restraints." (Id., ¶126.) Once McCullon managed to calm himself, his restraints were promptly removed. In fact, forty-five minutes later, on August 20, 2009, at 12:45 p.m., Lieutenant Stuart recorded that McCullon's restraints were removed. (Id., ¶127.) McCullon then received a final medical assessment on August 22, 2009, at 1:30 p.m., which noted no injuries sustained, no symptoms reported, no significant findings or apparent distress, and distal circulation intact in all extremities. (Id., ¶128.)

### 5.    **McCullon is Disciplined for Resisting Staff**

Following this episode, McCullon was cited for violating prison rules by resisting staff. McCullon was given advance notice of these charges, was provided

a two-day hearing on October 20 and November 12, 2009, was given the right to call witnesses, and was provided with the full panoply of procedural rights afforded inmates in this disciplinary setting.  At the close of these disciplinary proceedings, the prison Disciplinary Hearing Officer found that McCullon had violated prison rules and issued the following sanction against McCullon as a result of these violations: (a) twenty-seven days disallowed good conduct time; (b) thirty days disciplinary segregation; (c) 180 days loss of commissary privileges; and (d) 180 days loss of visiting privileges.  (Doc. 44, ¶60.)

It is against this factual background, a factual background largely viewed in the light depicted by the videotape, see Scott v. Harris, 550 U.S. 372, 380-81 (2007) that we now assess the Defendants' summary judgment motion.

## II.    **Discussion**

## A.    **Rule 56–The Legal Standard**

The Defendants have moved for judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. Rule 56(a).  Through summary adjudication a court is empowered to dispose of those claims that do not present a "genuine dispute as to any material fact," Fed. R. Civ.

P. 56(a), and for which a trial would be "an empty and unnecessary formality."
Univac Dental Co. v. Dentsply Int'l, Inc., No. 07-0493, 2010 U.S. Dist. LEXIS
31615, at *4 (M.D. Pa. Mar. 31, 2010).  The substantive law identifies which facts are
material, and "[o]nly disputes over facts that might affect the outcome of the suit
under the governing law will properly preclude the entry of summary judgment."
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute about a
material fact is genuine only if there is a sufficient evidentiary basis that would allow
a reasonable fact finder to return a verdict for the non-moving party.  Id. at 248-49.

The moving party has the initial burden of identifying evidence that it believes
shows an absence of a genuine issue of material fact.  Conoshenti v. Pub. Serv. Elec.
& Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004).  Once the moving party has shown
that there is an absence of evidence to support the nonmoving party's claims, "the
non-moving party must rebut the motion with facts in the record and cannot rest
solely on assertions made in the pleadings, legal memoranda, or oral argument."
Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord
Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)  If the nonmoving party "fails to
make a showing sufficient to establish the existence of an element essential to that
party's case, and on which that party will bear the burden at trial," summary judgment
is appropriate.  Celotex, 477 U.S. at 322.  Summary judgment is also appropriate if

the non-moving party provides merely colorable, conclusory, or speculative evidence. Anderson, 477 U.S. at 249.   There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts.  Id. at 252; see also, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In making this determination, the court must "consider all evidence in the light most favorable to the party opposing the motion."  A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

Moreover, a party who seeks to resist a summary judgment motion by citing to disputed material issues of fact must show by competent evidence that such factual disputes exist.  Moreover, a party who seeks to resist a summary judgment motion by citing to disputed material issues of fact must show by competent evidence that such factual disputes exist.  Further, "only evidence which is admissible at trial may be considered in ruling on a motion for summary judgment." Countryside Oil Co., Inc. v. Travelers Ins. Co., 928 F.Supp. 474, 482 (D.N.J.1995).  This rule applies with particular force to parties who attempt to rely upon hearsay statements to establish material issues of fact which would preclude summary judgment.  With respect to such claims, it is well-settled that:  "In this circuit, hearsay statements can be considered on a motion for summary judgment [only] if they are capable of admission at trial."  Shelton v. University of Medicine & Dentistry of N.J., 223 F.3d 220, 223,

n.2 (3d Cir. 2000), citing  Stelwagon Mfg. v. Tarmac Roofing Sys., Inc., 63 F.3d

1267, 1275, n.17 (3d Cir. 1995).  In this regard it has been aptly observed that:

> It is clear that when considering a motion for summary judgement, a
> court may only consider evidence which is admissible at trial, and that
> a party can not rely on hearsay evidence when opposing a motion for
> summary judgment. See Buttice v. G.D. Searle & Co., 938 F.Supp. 561
> (E.D.Mo.1996).  Additionally, a party must respond to a hearsay
> objection by demonstrating that the material would be admissible at trial
> under an exception to hearsay rule, or that the material is not hearsay.
> See Burgess v. Allstate Ins. Co., 334 F.Supp.2d 1351 (N.D.Ga.2003).
> The mere possibility that a hearsay statement will be admissible at trial,
> does not permit its consideration at the summary judgment stage.  Henry
> v. Colonial Baking Co. of Dothan, 952 F.Supp. 744 (M.D.Ala.1996).

Bouriez v. Carnegie Mellon Univ., No. 02-2104, 2005 WL 2106582,* 9 (W.D.Pa.

Aug. 26, 2005).  Thus, a party may not rely upon inadmissible hearsay assertions to

avoid summary judgment.  Therefore, where a party simply presents inadmissible

hearsay declarations in an attempt to establish a disputed material issue of fact, courts

have typically rebuffed these efforts and held instead that summary judgment is

appropriate.  See, e.g., Synthes v. Globus Medical, Inc., No. 04-1235, 2007 WL

2043184 (E.D.Pa. July 12, 2007); Bouriez v. Carnegie Mellon Univ., No. 02-2104,

2005 WL 2106582,* 9 (W.D.Pa. Aug. 26, 2005); Carpet Group Int'l v. Oriental Rug

Importers Assoc., Inc., 256 F.Supp.2d 249 (D.N.J. 2003).

Similarly, it is well-settled that:  "[o]ne cannot create an issue of fact merely

by . . . denying averments . . . without producing any supporting evidence of the

denials." Thimons v. PNC Bank, NA, 254 F.App'x 896, 899 (3d Cir. 2007)(citation omitted).  Thus, "[w]hen a motion for summary judgment is made and supported . . ., an adverse party may not rest upon mere allegations or denial." Fireman's Ins. Co. Of Newark NJ v. DuFresne, 676 F.2d 965, 968 (3d Cir. 1982), see Sunshine Books, Ltd. v. Temple University, 697 F.2d 90, 96 (3d Cir. 1982)."  "[A] mere denial is insufficient to raise a disputed issue of fact, and an unsubstantiated doubt as to the veracity of the opposing affidavit is also not sufficient." Lockhart v. Hoenstine, 411 F.2d 455, 458 (3d Cir. 1969).  Furthermore, "a party resisting a [Rule 56] motion cannot expect to rely merely upon bare assertions, conclusory allegations or suspicions."  Gans v. Mundy, 762 F.2d 338, 341 (3d Cir. 1985)(citing Ness v. Marshall, 660 F.2d 517, 519 (3d Cir. 1981)).

Finally, a party who seeks to resist a summary judgment motion must also comply with Local Rule 56.1, which specifically directs a party opposing a motion for summary judgment to submit a "statement of the material facts, responding to the numbered paragraphs set forth in the statement required [to be filed by the movant], as to which it is contended that there exists a genuine issue to be tried"; if the nonmovant fails to do so, "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted." L.R. 56.1.  Under the Local Rules, the failure to follow these instructions  and appropriately challenge the

material facts tendered by the Defendant means that those facts must be deemed, since:

> A failure to file a counter-statement equates to an admission of all the facts set forth in the movant's statement. This Local Rule serves several purposes. First, it is designed to aid the Court in its determination of whether any genuine issue of material fact is in dispute. Second, it affixes the burden imposed by Federal Rule of Civil Procedure 56(e), as recognized in <u>Celotex Corp. v. Catrett</u>, on the nonmoving party 'to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, *designated specific facts showing that there is a genuine issue for trial*.' 477 U.S. 317, 324 (1986) (internal quotations omitted) (emphasis added).

<u>Doe v. Winter</u>, No. 04-CV-2170, 2007 U.S. Dist. LEXIS 25517, *2 n.2 (M.D. Pa. Apr. 5, 2007) (parallel citations omitted; court's emphasis).  A party cannot evade these litigation responsibilities in this regard simply by citing the fact that he is a *pro se* litigant.  These rules apply with equal force to all parties.  <u>See</u> <u>Sanders v. Beard</u>, No. 09-CV-1384, 2010 U.S. Dist. LEXIS, *15 (M.D. Pa. July 20, 2010) (*pro se* parties "are not excused from complying with court orders and the local rules of court"); <u>Thomas v. Norris</u>, No. 02-CV-01854, 2006 U.S. Dist. LEXIS 64347, *11 (M.D. Pa. Sept. 8, 2006) (*pro se* parties must follow the Federal Rules of Civil Procedure).

Furthermore, in a case such as this, where critical events at issue have been captured on videotape, the court is obliged to consider that videotaped evidence in determining whether there is any genuine dispute as to material facts.  In fact, it is

clear that, in this setting, we must view the facts in the light depicted by the videotape.  See <u>Scott v. Harris</u>, 550 U.S. 372, 380-81 (2007) (reversing court of appeals ruling with respect to application of qualified immunity in an excessive force case, noting that the court of appeals erred by accepting a version of facts that was shown to be a "visible fiction" and admonishing that the lower court "should have viewed the facts in the light depicted by the videotape.").  This principle applies with particular force to inmate excessive force claims which entail videotaped encounters with staff.  Where a videotape refutes an inmate's claims that excessive force was used against him, and the video evidence does not permit an inference that prison officials acted maliciously and sadistically, summary judgment is entirely appropriate. <u>Tindell v. Beard</u>, 351 F. App'x 591 (3d Cir. 2009).

### B. <u>Constitutional Standards Governing Eighth Amendment Claims</u>

In conducting this legal analysis we must also be mindful of the constitutional standards which govern Eighth Amendment claims, since McCullon advance two distinct Eighth Amendment claims against the remaining Defendants in his complaint. In our view, McCullon alleges, with varying degrees of clarity, constitutional claims under the Eighth Amendment, asserting at various times that prison staff violated his Eighth Amendment rights by:  (1) using excessive force against him; and by (2)

displaying deliberate indifference to his medical needs while he was briefly restrained.

Each of these Eighth Amendment claims is, in turn, judged against settled legal principles, principles which set precise and exacting standards for asserting a constitutional infraction. All of the various claims, however, are governed by the same overarching and animating constitutional benchmarks. As the United States Court of Appeals for the Third Circuit has observed:

> The Eighth Amendment protects against infliction of "cruel and unusual punishment." However, "not every governmental action affecting the interests or well-being of a prisoner is subject to Eighth Amendment scrutiny." Whitley v. Albers, 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). "After incarceration, only the unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment." Id. (citation and internal quotations omitted). "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock." Id.

> Resolution of an Eighth Amendment claim therefore "mandate[s] an inquiry into a prison official's state of mind." Wilson v. Seiter, 501 U.S. 294, 299, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). Two considerations define that inquiry. We must first determine if the deprivation was sufficiently serious to fall within the Eighth Amendment's zone of protections. Id. at 298, 111 S.Ct. 2321. If not, our inquiry is at an end. However, if the deprivation is sufficiently serious, we must determine if the officials acted with a sufficiently culpable state of mind. Id. In other words, we must determine if they were motivated by a desire to inflict unnecessary and wanton pain. "What is necessary to establish an

'unnecessary and wanton infliction of pain ...' varies according to the nature of the alleged constitutional violation." <u>Hudson v. McMillian</u>, 503 U.S. 1, 5, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992).

<u>Fuentes v. Wagner</u>, 206 F.3d 335, 344-45 (3d Cir. 2000)

With these tenets in mind we turn to a consideration of the individual Eighth Amendment claims advanced here by McCullon.

### 1.   **Excessive Force Claims**

At the outset, Eighth Amendment excessive force claims entail a showing of some subjective intent to injure.  In an excessive force case, where "prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in <u>Whitley</u>[v. Albers, 475 U.S. 312 (1986)]: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." <u>Hudson v. McMillian</u>, 503 U.S. 1, 6-7 (1992).

Thus, the keystone to analysis of an Eighth Amendment excessive force claim often entails issues of motivation–whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.  <u>Hudson v. McMillian</u>, 503 U.S. 1, 6-7 (1992).  However, the issue of whether excessive force was used is one which, in proper circumstances, can be determined as a matter of law. In such cases, summary judgment is appropriate when "it appears that the evidence,

viewed in the light most favorable to the plaintiff, will [not] support a reliable
inference of wantonness in the infliction of pain." Brooks v. Kyler, 204 F.3d 102,
106 (3d Cir. 2000) (quoting Whitley, 475 U.S. at 322). There are several factors that
a court examines in determining whether a correctional officer has used excessive
force in violation of the Eighth Amendment, including:   "(1) 'the need for the
application of force'; (2) 'the relationship between the need and the amount of force
that was used'; (3) 'the extent of injury inflicted'; (4) 'the extent of the threat to the
safety of staff and inmates, as reasonably perceived by responsible officials on the
basis of the facts known to them'; and (5) 'any efforts made to temper the severity of
a forceful response.'" Id. at 106.

    When considering such claims, the reasonableness of a particular use of force
is often dependent upon factual context and must be "judged from the perspective of
a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."
Graham v. Connor, 490 U.S. 386, 396-7 (1989).  Moreover, in the context of prison
excessive force claims, in determining **"whether force was applied in a good-faith
effort to maintain or restore discipline, or maliciously and sadistically to cause harm,"**
Hudson v. McMillian, 503 U. S. 1, 6-7 (1992), "even if we concede [that an inmate]
has established at most that prison officials over-reacted to the disturbance that he
caused. . . , any such over-reaction would still fall short of supporting a finding that

prison officials acted 'maliciously and sadistically to cause harm.'" <u>Fuentes v.</u> <u>Wagner</u>, 206 F.3d 335, 346 (3d Cir. 2000).

Moreover, in assessing such claims in a case where an encounter is captured on videotape we are mindful of the fact that when "videotape refutes [an inmate's] assertion that defendant[s] used excessive force," or when the "video shows that [an inmate] did not suffer any physical distress, and a medical report indicates that he had no visible swelling or injuries," we should conclude "viewing the evidence in the light most favorable to [the inmate that], no reasonable finder of fact could view the video of the incident and determine that [defendants] acted maliciously and sadistically," and may enter summary judgment on an excessive force claim. <u>Tindell</u> <u>v. Beard</u>, 351 F. App'x 591, 596 (3d Cir. 2009).

Further, in the specific factual context of excessive force claims based upon allegations relating to a prisoner's handcuffing, courts have acknowledged that, in certain instances, government officials are entitled to qualified immunity as a matter of law. <u>Gilles v. Davis</u>, 427 F.3d. 197, 207 (3d Cir. 2005). With respect to these particular excessive force claims, the test for qualified immunity can be simply stated: "In these cases, summary judgment for an officer who claims qualified immunity is appropriate where, 'after resolving all factual disputes in favor of the plaintiff,[ ] the officer's use of force was objectively reasonable under the circumstances.' " <u>Id.</u>

## 2.    Deliberate Indifference Claims

Beyond his claims that he was subjected to excessive force by staff, McCullon also seems to allege that prison officials left him in physical restraints for an excessive period of time.  Inmate Eighth Amendment claims involving the "prolonged use of restraints. . . [are] more properly analyzed under the [Eighth Amendment's] deliberate indifference standard.  See A.M. ex. rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr., 372 F.3d 572, 587 (3d. Cir.2004) (deliberate indifference standard appropriate where it did not appear that officials 'were required to make split-second decisions to maintain or restore order through the use of excessive physical force'); Howard v. Bureau of Prisons, Civ. A. No. 3:05–CV–1372, 2008 WL 318387, at *13 (M.D.Pa. Feb.4, 2008) ('Outside the context of a prison disturbance, which is characterized as "a single instance of prisoner unrest where there is a need to act quickly," Eighth Amendment claims are judged by the deliberate indifference standard.'); Trammell v. Keane, 338 F.3d 155, 162–63 (2d Cir.2003) (applying deliberate indifference standard in determining whether deprivation orders, depriving prisoner of certain amenities, were reasonably calculated to restore prison discipline and security)." Womack v. Smith, 1:06-CV-2348, 2011 WL 819558 (M.D. Pa. Mar. 2, 2011.  Under this Eighth Amendment analytical paradigm, courts recognize that prison officials may not be deliberately indifference to harms or injuries suffered by

-28-

inmates.  In <u>Beers-Capitol v. Whetzel</u>, 256 F.3d 120 (3d Cir. 2001), the Court of

Appeals explained the basic requirements of deliberate indifference claim brought

against a prison official under the Eighth Amendment as follows:

> An Eighth Amendment claim against a prison official must meet two
> requirements: (1) "the deprivation alleged must be, objectively,
> sufficiently serious;" and (2) the "prison official must have a sufficiently
> culpable state of mind."

<u>Id.</u> at 125 (quoting <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994)).  Furthermore, in

cases involving prison safety or prison conditions, the relevant state of mind "is one

of 'deliberate indifference' to inmate health or safety."   <u>Id.</u>   This deliberate

indifference standard "is a subjective standard under <u>Farmer</u> – the prison official-

defendant must actually have known or been aware of the excessive risk to inmate

safety."  <u>Id.</u>  Thus, " '[d]eliberate indifference can be shown when a prison official

*knows of and disregards* an excessive risk to inmate health or safety' <u>Hamilton v.</u>

<u>Leavy</u>, 117 F.3d 742, 747 (3d Cir. 1997) (quotation marks omitted)(emphasis added).

Accordingly, "to survive summary judgment on an Eighth Amendment claim asserted

under 42 U.S.C. § 1983, a plaintiff is required to produce sufficient evidence of (1)

a substantial risk of serious harm; (2) the defendants' deliberate indifference to that

risk; and (3) causation." <u>Davis v. Williams</u>, 354 F. App'x 603, 605-606 (3d Cir.

2009).

As explained in <u>Beers-Capitol</u>, in Eighth Amendment cases based on allegations of deliberate indifference on the part of prison officials or other supervisory defendants, the Supreme Court has "rejected an objective test for deliberate indifference; instead it looked to what the prison official actually knew rather than what a reasonable official in his position would have known." <u>Id.</u> at 131. Specifically, the Supreme Court "held that 'a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety.'" <u>Id.</u> (quoting <u>Farmer</u>, 511 U.S. at 837). This requirement of actual knowledge on the part of supervisory officials "means that 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" <u>Id.</u> (quoting <u>Farmer</u>, 511 U.S. at 837).

These principles apply with particular force to Eighth Amendment claims premised upon inadequate medical care. In the medical context, a constitutional violation under the Eighth Amendment occurs only when officials are deliberately indifferent to an inmate's serious medical needs. <u>Estelle v. Gamble</u>, 429 U.S. 97, 105 (1976). To establish a violation of his constitutional right to adequate medical care in accordance with this standard, an inmate is required to point to evidence that

demonstrates:   (1) a serious medical need, and (2) acts or omissions by prison officials that indicate deliberate indifference to that need. Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999).

Deliberate indifference to a serious medical need involves the "unnecessary and wanton infliction of pain." Estelle, 429 U.S. at 104.  Such indifference may be evidenced by an intentional refusal to provide care, delayed provision of medical treatment for non-medical reasons, denial of prescribed medical treatment, denial of reasonable requests for treatment that results in suffering or risk of injury, Durmer v. O'Carroll, 991 F.2d 64, 68 (3d Cir. 1993), or "persistent conduct in the face of resultant pain and risk of permanent injury," White v. Napoleon, 897 F.2d 103, 109 (3d Cir. 1990).

However, it is also clear that the mere misdiagnosis of a condition or medical need, or negligent treatment provided for a condition, is not actionable as an Eighth Amendment claim because medical malpractice is not a constitutional violation. Estelle, 429 U.S. at 106.  "Indeed, prison authorities are accorded considerable latitude in the diagnosis and treatment of prisoners." Durmer, 991 F.2d at 67 (citations omitted).  Furthermore, in a prison medical context, deliberate indifference is generally not found when some significant level of medical care has been offered to the inmate. Clark v. Doe, 2000 U.S. Dist. LEXIS 14999, 2000 WL 1522855, at *2

(E.D.Pa. Oct. 13, 2000)("courts have consistently rejected Eighth Amendment claims where an inmate has received some level of medical care").  Thus, such complaints fail as constitutional claims under § 1983 since "the exercise by a doctor of his professional judgment is never deliberate indifference.  See e.g. Brown v. Borough of Chambersburg, 903 F.2d 274, 278 (3d Cir.1990) ('[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights.')".  Gindraw v. Dendler, 967 F.Supp. 833, 836 (E.D. Pa. 1997). Applying this exacting standard, courts have frequently rejected Eighth Amendment claims that are based upon the level of professional care that an inmate received; see, e.g., Ham v. Greer, 269 F. App'x 149 (3d Cir. 2008); James v. Dep't of Corrections, 230 F. App'x 195 (3d. Cir. 2007); Gillespie v. Hogan, 182 F. App'x 103 (3d Cir. 2006); Bronson v. White, No. 05-2150, 2007 WL 3033865 (M.D. Pa. Oct. 15, 2007); Gindraw v. Dendler, 967 F.Supp. 833 (E.D. Pa. 1997), particularly where it can be shown that significant medical services were provided to the inmate but the prisoner is dissatisfied with the outcome of these services. James, 230 F. App'x. at 197-98(citations omitted).  In short, in the context of the Eighth Amendment, any attempt to second-guess the propriety or adequacy of a particular course of treatment is disavowed by courts since such determinations remain a question of sound

professional judgment.  <u>Inmates of Allegheny County Jail v. Pierce</u>, 612 F.2d 754,

762 (3d Cir. 1979) (quoting <u>Bowring v. Godwin</u>, 551 F.2d 44, 48 (4th Cir. 1977)).

There is a necessary corollary to this principle, limiting the reach of the Eighth

Amendment in a prison medical setting.  In a case such as this, where the inmate

received on-going medical care, it is also well-established that non-medical

correctional staff may not be "considered deliberately indifferent simply because they

failed to respond directly to the medical complaints of a prisoner who was already

being treated by the prison doctor." <u>Durmer v. O'Carroll</u>, 991 F.2d 64, 69 (3d. Cir.

1993).  The rationale for this rule has been aptly explained by the United States Court

of Appeals for the Third Circuit in the following terms:

> If a prisoner is under the care of medical experts . . . , a non-medical
> prison official will generally be justified in believing that the prisoner
> is in capable hands. This follows naturally from the division of labor
> within a prison. Inmate health and safety is promoted by dividing
> responsibility for various aspects of inmate life among guards,
> administrators, physicians, and so on.  Holding a non-medical prison
> official liable in a case where a prisoner was under a physician's care
> would strain this division of labor.  Moreover, under such a regime, non-
> medical officials could even have a perverse incentive *not* to delegate
> treatment responsibility to the very physicians most likely to be able to
> help prisoners, for fear of vicarious liability.  Accordingly, we conclude
> that, absent a reason to believe (or actual knowledge) that prison doctors
> or their assistants are mistreating (or not treating) a  prisoner, a non-
> medical prison official . . . will not be chargeable with the Eighth
> Amendment scienter requirement of deliberate indifference.

<u>Spruill v. Gillis,</u> 372 F.3d 218, 236 (3d. Cir. 2004).

Applying this standard, courts have repeatedly held that, absent some reason to believe that prison medical staff are mistreating prisoners, non-medical corrections staff who refer inmate medical complaints to physicians may not be held personally liable for medically-based Eighth Amendment claims.  See, e.g., Johnson v. Doughty, 433 F.3d 1001 (7th Cir. 2006); Spruill v. Gillis, supra; Durmer v. O'Connor, supra; Garvey v. Martinez, No. 08-2217, 2010 WL 569852 (M.D. Pa. Feb. 11, 2010); Hodge v. United States. No. 06-1622, 2007 WL 2571938 (M.D. Pa. Aug. 31, 2007).

Furthermore, it is important to note that these constitutional protections are only triggered by excessive and prolonged confinement in restraints.  Thus, courts have recognized that brief periods in restraints of twenty fours or less typically will not give rise to an Eighth Amendment deliberate indifference claim.  See, e.g., Key v. McKinney, 176 F.3d 1083, 1086 (8th Cir.1999) (no Eighth Amendment violation where prisoner handcuffed and shackled for 24 hours); Hunter v. Bledsoe, No. 10-CV-927, 2010 WL 3154963 (M.D.Pa. Aug.9, 2010) (ambulatory restraints used for 24 hours); Holley v. Johnson, No. 08-CV-629, 2010 WL 2640328 (W.D.Va. June 30, 2010) (ambulatory restraints used for 48 hours); Zimmerman v. Schaeffer, 654 F.Supp.2d 226, 232 (M.D.Pa. 2009)(19 hours or more in restraint chair); Moore v. Miller, No. 7:08CV00614, 2009 WL 113258 (W.D.Va. Jan.15, 2009) (26 hours); Keyes v. O'Brien, No. Civ. A. 7:06CV00437, 2006 WL 2125912 (W.D.Va. July 27,

2006) (no Eighth Amendment violation where prisoner placed in ambulatory restraints for 30 hours); Garraway v. United States, No. 04–CV–01049, 2006 WL 3054606, at *8 (D.Colo. July 24, 2006) (50 hours in ambulatory restraints); Saleh v. Ray, No. Civ. A. 02–3214, 2003 WL 23484639, at * 6 (D.Kan.2003) (24 hours in ambulatory restraints, no Eighth Amendment violation).

### C.   The Defendants Are Entitled to Summary Judgment

### 1.   McCullon's Excessive Force Claims Fail

Guided by these benchmarks, we conclude that the Defendants are entitled to summary judgment in this case on McCullon's Eighth Amendment excessive force claims since the immutable witnesses, the videotape evidence, plainly "refutes [McCullon]'s assertion that defendant[s] used excessive force," and we conclude "viewing the evidence in the light most favorable to [the inmate that], no reasonable finder of fact could view the video of the incident and determine that [defendants] acted maliciously and sadistically." Tindell v. Beard, 351 F. App'x 591, 596 (3d Cir. 2009).

Turning first to McCullon's execssive force claims against Lieutenant Stuart arising out of his cell extraction, there is nothing in the videotape depiction of this procedure that could even remotely be characterized as in any way malicious or sadistic, the essential prerequisite to an Eighth Amendment violation.  Quite the

contrary, the video is striking and notable for the restraint exhibited by correctional staff, and for the care and attention which they give to McCullon's superficial finger injury.  Observing the videotape it is simply impossible to say that any " reasonable finder of fact could view the video of the incident and determine that [defendants] acted maliciously and sadistically." Tindell v. Beard, 351 F. App'x 591, 596 (3d Cir. 2009).  Therefore, summary judgment is appropriate here as to this claim.

Further, the surveillance video depicting McCullon's initial encounter with Officer Brouse does not reveal anything which remotely approaches the malicious use of force against McCullon by the Defendant.  Indeed, the only malicious act depicted in this video is McCullon's act of hurling food trays into the corridor through the wicket slot.  McCullon's efforts to justify this act, and bootstrap an excessive force claim in this setting, are unavailing.  In particular, the video evidence does not support any claim by McCullon that Officer Brouse acted sadistically when he applied restraints to the Plaintiff.  Officer Bouse's physical contact with McCullon in applying and removing these restraints was fleeting and unremarkable, except for the remarkably angry response which it inspired in McCullon, who began throwing articles from his cell.  Presented with this sudden anger by McCullon the surveillance video reflects an appropriate use of minimal force by Officer Brouse to close and secure the wicket slot, an action which was compelled by McCullon's use of this

aperture as the launching site for hurling objects from his cell.  On these immutable

facts, summary judgment in favor of Officer Brouse is entirely appropriate here.

### 2.    McCullon's Deliberate Indifference Claims Are Also Unavailing

Nor can McCullon sustain a deliberate indifference claim based upon the fact

that he was held in restraints for approximately twenty-four hours after this angry

outburst.  At the outset, the duration of this period of restraint–24 hours–simply does

not implicate grave Eighth Amendment concerns.  See, e.g., Key v. McKinney, 176

F.3d 1083, 1086 (8th Cir.1999) (no Eighth Amendment violation where prisoner

handcuffed and shackled for 24 hours); Hunter v. Bledsoe, No. 10-CV-927, 2010 WL

3154963 (M.D.Pa. Aug.9, 2010) (ambulatory restraints used for 24 hours); Holley v.

Johnson, No. 08-CCV-629, 2010 WL 2640328 (W.D.Va. June 30, 2010) (ambulatory

restraints used for 48 hours); Zimmerman v. Schaeffer, 654 F.Supp.2d 226, 232

(M.D.Pa. 2009)(19 hours or more in restraint chair); Moore v. Miller, No.

7:08CV00614, 2009 WL 113258 (W.D.Va. Jan.15, 2009) (26 hours); Keyes v.

O'Brien, No. Civ. A. 7:06CV00437, 2006 WL 2125912 (W.D.Va. July 27, 2006) (no

Eighth Amendment violation where prisoner placed in ambulatory restraints for 30

hours); Garraway v. United States, No. 04–CV–01049, 2006 WL 3054606, at *8

(D.Colo. July 24, 2006) (50 hours in ambulatory restraints); Saleh v. Ray, No. Civ.

A. 02–3214, 2003 WL 23484639, at * 6 (D.Kan.2003) (24 hours in ambulatory restraints, no Eighth Amendment violation)**.**

Moreover, the use of these restraints was both reasonable and necessary in light of McCullon's violent behavior and agitated demeanor on August 19-20, 2009. Indeed, it is undisputed that staff used the restraints in a measured fashion, and in a manner which was directly linked to the penological goals of ensuring institutional safety, as illustrated by the fact that the restraints were removed shortly after McCullon gained control of his emotions, and was able to present in a rational and non-threatening manner.  Furthermore, the meticulous care and attention which McCullon received from prison medical and correctional staff while in restraints belies any claim of deliberate indifference to his physical needs.  In sum, the use of restraints here was in direct response to McCullon's violent behavior.  Those restraints were employed for a limited period of time, and were removed promptly once McCullon exhibited behavior which indicated that he no longer presented a threat to himself, fellow inmates, or staff.  On these facts, a deliberate indifference claim fails, and the Defendants are entitled to summary judgment in their favor.[5]

---

[5]In particular, we note that summary judgment is particularly appropriate for Defendant Sassaman who only checked McCullon's restraints on one occasion. On August 19, 2009 at 6:00 p.m., McCullon demanded to see medical staff for the cut on his finger.  Defendant Sassaman informed him that medical staff would be around to conduct checks shortly, and in fact staff examined McCullon at 7:15

Finally, we note that the use of these restraints was closely monitored by medical personnel throughout August 19-20, 2009, and those medical staff observed no medical reason to remove these restraints. Since it is axiomatic that correctional staff cannot be held deliberately indifferent when the defer to medical personnel on medical matters, Durmer v. O'Carroll, 991 F.2d 64, 69 (3d. Cir. 1993), this fact also compels summary judgment in favor of these remaining correctional defendants on this deliberate indifference claim.

## 3.   __Qualified Immunity__

But even if McCullon had stated a colorable constitutional claim relating to his hand-cuffing, the Defendants would still be entitled to qualified immunity from these claims for damages. In order to establish a civil rights claim McCullon must show the deprivation of a right secured by the United States Constitution or the laws of the United States. Satisfying these elements alone, however, does not guarantee that McCullon is entitled to recover damages from these public officials. Government officials performing "discretionary functions," are insulated from suit if their conduct did not violate a "clearly established statutory or constitutional right[] of which a reasonable person would have known." Wilson v. Layne, 526 U.S. 603, 609 (1999); see also Pearson v. Callahan, 555 U.S. 223 (2009). This doctrine, known as qualified

---

p.m., and found that he was not in distress.

immunity, provides officials performing discretionary functions not only defense to liability, but also "immunity from suit." <u>Crouse v. S. Lebanon Twp.</u>, 668 F. Supp. 2d 664, 671 (M.D. Pa. 2009) (Conner, J.) (citations omitted).  Qualified immunity:

> balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.  The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."

<u>Pearson</u>, 555 U.S. at 231.

Determinations regarding qualified immunity, and its application in a given case, require a court to undertake two distinct inquiries.  First, the court must evaluate whether the defendant violated a constitutional right.  <u>Saucier v. Katz</u>, 533 U.S. 194, 201-02 (2001), abrogated in part by <u>Pearson</u>, 555 U.S. 223; <u>Curley v. Klem</u>, 499 F.3d 199, 206 (3d Cir. 2007); <u>Williams v. Bitner</u>, 455 F.3d 186, 190 (3d Cir. 2006).  If the defendant did not actually commit a constitutional violation, then the court must find in the defendant's favor.  <u>Saucier</u>, 533 U.S. at 201.  If the defendant is found to have committed a constitutional violation, the court must undertake a second, related inquiry to assess whether the constitutional right in question was "clearly established" at the time the defendant acted.  <u>Pearson</u>, 555 U.S. at 232; <u>Saucier</u>, 533 U.S. at 201-02.  The Supreme Court has instructed that a right is clearly established for purposes

of qualified immunity if a reasonable state actor under the circumstances would understand that his conduct violates that right.  Williams, 455 F.3d at 191 (citing Saucier, 533 U.S. at 202).

 In order to find that a right is clearly established, "the right allegedly violated must be defined at the appropriate level of specificity." Wilson, 526 U.S. at 615.  The Supreme Court has explained that, at least in some cases, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful." Hope v. Pelzer, 536 U.S. 730, 741 (2002) (quoting United States v. Lanier, 520 U.S. 259, 271 (1997) (internal quotation marks and citation omitted)).  In some cases, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Wilson, 455 F.3d at 191 (quoting Hope, 536 U.S. at 741).

The court is no longer required to conduct these two inquiries sequentially, Pearson, 555 U.S. at 239-40, and it may forego difficult constitutional issues and award qualified immunity to a defendant if it is apparent that the defendant did not violate rights that were clearly established at the time the defendant acted. Id.  Where a court elects to address the alleged constitutional violations, however, the court's analysis of the merits for purposes of summary judgment merges with analysis of the

deprivation of federal rights for purposes of qualified immunity.  Gruenke v. Seip,

225 F.3d 290, 299-300 (3d Cir. 2000); Crouse, 668 F. Supp. 2d at 671; see also Grant

v. City of Pittsburgh, 98 F.3d 116, 122 (3d Cir. 1996) ("[C]rucial to the resolution of

[the] assertion of qualified immunity is a careful examination of the record . . . to

establish . . . a detailed factual description of the actions of each individual defendant

(viewed in a light most favorable to the plaintiff).")  Because qualified immunity

entails a consideration of whether the law was clearly established at the time of a

defendant's conduct, this defense, which focuses on the state of the law, presents a

question of law for the court, and one which can often be resolved on summary

judgment.  See Montanez v. Thompson, 603 F.3d 243 (3d Cir. 2010).

        In the specific factual context of excessive force claims based upon allegations

relating to a prisoner's handcuffing, courts have acknowledged that, in certain

instances, summary judgment is entirely appropriate.  Gilles v. Davis, 427 F.3d. 197,

207 (3d Cir. 2005).  With respect to these particular excessive force claims, courts

agree that:  "In these cases, summary judgment for an officer who claims qualified

immunity is appropriate where, 'after resolving all factual disputes in favor of the

plaintiff,[ ] the officer's use of force was objectively reasonable under the

circumstances.' "  Gilles v. Davis, 427 F.3d 197, 207 (3d Cir. 2005).

Applying these benchmarks, and viewing the actions of correctional staff in the light depicted by the videotapes, we find that the Defendants are entitled to qualified immunity in this case.  Nothing in the measured and restrained conduct depicted in the videos could have alerted these officials that their actions violated "clearly established statutory or constitutional right[] of which a reasonable person would have known." Wilson v. Layne, 526 U.S. 603, 609 (1999).  Moreover, the duration of McCullon's detention in restraints fell well within the 24 hour time frame which had previously and repeatedly been recognized as a discrete period of time which did not give rise to constitutional concerns.  See, e.g., Key v. McKinney, 176 F.3d 1083, 1086 (8th Cir.1999) (no Eighth Amendment violation where prisoner handcuffed and shackled for 24 hours); Hunter v. Bledsoe, No. 10-CV-927, 2010 WL 3154963 (M.D.Pa. Aug.9, 2010) (ambulatory restraints used for 24 hours); Holley v. Johnson, No. 08-CCV-629, 2010 WL 2640328 (W.D.Va. June 30, 2010) (ambulatory restraints used for 48 hours); Zimmerman v. Schaeffer, 654 F.Supp.2d 226, 232 (M.D.Pa. 2009)(19 hours or more in restraint chair).  Therefore, these officials should be entitled to qualified immunity from damages in this case.

## III.   **Recommendation**

Accordingly, for the foregoing reasons, IT IS RECOMMENDED that the Defendants' motion for summary judgment (Doc. 114.) be GRANTED and, in light

of this recommended disposition of the Defendants' motion, IT IS FURTHER RECOMMENDED that McCullon's motions in opposition to the Defendants' motions for summary judgment (Docs. 124, 136, 152.), which are actually simply responses in opposition to that motion, be denied as moot.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof.  Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 7th day of September 2012.

*S/Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge